**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**SOUTHERN DIVISION**

| | |
|---|---|
| FELICIA COOPER, GARY SELF, CHARLES MITCHELL, CHARLES RIGGS, and PEGGY LONG, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONWIDE RECOVERY SERVICE, INC.,<br><br>Defendant. | Case No. 1:25-cv-00130<br><br>Judge Travis R. McDonough<br>Magistrate Judge Christopher H. Steger<br><br>Class Action<br><br>JURY DEMAND |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Felicia Cooper, Gary Self, Charles Mitchell, Charles Riggs, and Peggy Long, individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Defendant Nationwide Recovery Service, Inc. ("NRS" or "Defendant"), and upon personal knowledge as to their own actions, and information and belief as to all other matters, allege as follows:

## INTRODUCTION

1. This action arises from Defendant's wrongful exposure of Plaintiffs' and Class Members' confidential Personally Identifying Information[1] ("PII") and Protected Health Information ("PHI")[2] (collectively "Personal Information"), in a foreseeable, and entirely

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the Data Breach.

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and

preventable data breach of NRS's systems, caused by Defendant's failure to adequately safeguard that Personal Information in their care ("Data Breach").

2. According to Defendant, the Personal Information unauthorizedly disclosed in the Data Breach includes Plaintiffs' and Class Members' names, addresses, dates of birth, Social Security numbers, financial account information, and medical information.[3]

3. Defendant is a collections agent that provides customer service, collections, and recovery management experience, and other financial servicing to clients across industries.[4]

4. Plaintiffs and Class Members are current and former patients of NRS's healthcare provider clients, who were required to provide their Personal Information to NRS prior to the Data Breach.

5. Defendant failed to undertake adequate measures to safeguard the Personal Information Plaintiffs and Class Members entrusted to them.

6. Although NRS purportedly discovered the Data Breach in July of 2024, Defendant

---

its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia*, a group health plan. *Id. Covered entity, Health plan*. A "business associate" is defined as, with respect to a covered entity, a person who: "creates, receives, maintains, or transmits protected health information for a function or activity regulated by [HIPAA], including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, patient safety activities listed at 42 CFR 3.20, billing, benefit management, practice management and repricing…" *Id. Business associate*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, Dep't for Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 5, 2022). NRS is clearly a "business associate," subject to HIPAA, and some of the PHI compromised in the Data Breach is "protected health information," subject to HIPAA.

[3] *See* Notice of Data Breach ("Notice"), attached hereto as **Exhibit A**.

[4] https://www.linkedin.com/company/nationwiderecoveryservice.

failed to immediately notify and warn Plaintiffs and Class Members, instead waiting until March 28, 2025 to provide written notice to Plaintiffs and the Class that their Personal Information had been compromised.[5]

7. As a direct and proximate result of Defendant's failure to protect Plaintiffs' and Class Members' sensitive Personal Information and warn them promptly and fully about the Data Breach, Plaintiffs and Class Members have suffered widespread injury and damages, such that Plaintiffs seek relief on a class-wide basis.

## PARTIES

### *Plaintiffs*

8. Plaintiff Felicia Cooper is a natural person and resident and citizen of Georgia, where she intends to remain. Plaintiff Cooper is a former patient of one of NRS's healthcare provider clients, and a Data Breach victim.

9. Plaintiff Gary Self is a natural person and resident and citizen of Georgia, where he intends to remain. Plaintiff Self is a former patient of one of NRS's healthcare provider clients, and a Data Breach victim.

10. Plaintiff Charles Mitchell is a natural person and resident and citizen of Georgia, where he intends to remain. Plaintiff Mitchell is the guardian of his mother, who is a patient of one of NRS's healthcare provider clients, and a Data Breach victim.

11. Plaintiff Charles Riggs is a natural person and resident and citizen of Tennessee, where he intends to remain. Plaintiff Riggs is a former patient of one of NRS's healthcare provider clients, and a Data Breach victim.

12. Plaintiff Peggy Long is a natural person and resident and citizen of North Carolina,

---

[5] Exhibit A.

where she intends to remain. Plaintiff Long is a former patient of one of NRS's healthcare provider clients, and a Data Breach victim.

### *Defendant*

13. Defendant is a Tennessee corporation with a principal place of business at 545 West Inman Street, Cleveland, TN 37311. NRS may be served by serving its registered agent Cogency Global, Inc. at 992 Davidson Drive, Ste. B, Nashville, TN 37205-1051.

## JURISDICTION & VENUE

14. This Court has original jurisdiction over this action under the Class Action Fairness Act 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant, namely Plaintiffs Mitchell, Cooper, Long, and Self.

15. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Tennessee, and Defendant regularly conducts business and enters into contracts within the state of Tennessee.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because NRS's principal place of business is in this District and a substantial art of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND FACTS

### A. NRS

17. NRS provides collection services to companies including health care facilities.

18. NRS boasts a total revenue of $86.1 million.[6]

---

[6] Zoominfo, NRS, https://www.zoominfo.com/c/national-recoveries-inc/26771568 (last visited April 21, 2025).

19. NRS's software services are specialized for corporations and healthcare providers who manage highly sensitive data. NRS thus must oversee, manage, and protect the Personal Information of its clients' patients.

20. On information and belief, these third-party patients, whose Personal Information was collected by NRS, do not do any business with NRS directly.

21. In working with third party consumers' highly sensitive data, NRS advertises that it "implement[s] security measures to protect your information[.]"[7]

22. Despite recognizing its duty to do so, on information and belief, NRS has not implemented reasonable cybersecurity safeguards or policies to protect patients' Personal Information or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, NRS leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to its clients' patients' Personal Information.

23. On information and belief, healthcare provider clients contract NRS to perform medical billing and collections services for the healthcare provider.

24. NRS received, used, and maintained Plaintiffs' and Class Members' Personal Information in the course of its contracts with its clients, Plaintiffs' and Class Members' healthcare providers.

25. Plaintiffs' and Class Members' healthcare providers required their patients to provide their Personal Information as a condition and in exchange for receiving medical treatment and related services. Plaintiffs' and Class Members' healthcare providers in turn share the Personal Information with NRS in connection with NRS performing its contracted services.

26. NRS collects and stores Plaintiff's and the proposed Class Members' Personal

[7] Privacy Policy, https://nrsagency.com/privacy-policy/ (last visited April 21, 2025).

Information on its information technology computer systems, including but not limited to their names, addresses, dates of birth, Social Security numbers, financial account information, and medical information, among other sensitive data.

27. On information and belief, all NRS's contracts with its healthcare provider clients required NRS to maintain adequate and legally compliant safeguards for the Personal Information it received and maintained.

28. None of the purposes for which Defendant may disclose patient Personal Information without authorization include exposure to cybercriminals in a Data Breach, like what happened here.

29. Despite their alleged commitments to securing sensitive patient data, Defendant does not follow industry standard practices in securing patients' Personal Information and failed to protect the Personal Information of Plaintiff and the proposed Class Members from unauthorized disclosure in the Data Breach.

**B. Defendant Fail to Safeguard Personal Information, Causing the Data Breach**

30. According to Defendant, the Data Breach occurred beginning on or around July 2024, when NRS experienced a cyberattack to its computer information technology systems by an unauthorized actor, resulting in the unauthorized disclosure and exfiltration of patients' Personal Information, including of Plaintiffs and Class Members.[8]

31. The Personal Information targeted and stolen in the Data Breach includes Plaintiffs' and Class Members' names, addresses, dates of birth, Social Security numbers, financial account information, and medical information.[9]

32. Nevertheless, Defendant waited nearly a ***full year*** to inform impacted current and

---

[8] Exhibit A.
[9] *Id.*

former patients of the unauthorized disclosure of their Personal Information's compromise in the Data Breach, waiting until March 2025 to provide written notice to Plaintiffs and the Class.[10]

33. Indeed, the delay in notification alone shows that Defendant failed to implement and maintain a reasonable cybersecurity incident response plan, which are in part designed to ensure compliance with data breach notification requirements—which in TN requires notice within 45 days.

34. Moreover, a reasonable cybersecurity incident response plan is one of the most fundamental and basic administrative safeguards. If Defendant failed to get this most basic step right, it stands to reason that the more difficult, expensive, and industry standard safeguards were ignored as well.

35. Still further, Defendant's cybersecurity posture was so insufficient that the hackers were able to infiltrate Defendant's network and stay there for nearly a week before Defendant even realized malicious activity was occurring. This reasonably implies that Defendant lacked reasonable logging, monitoring, and centralized alerting systems sufficient to reasonable alert Defendant's staff to intrusions or malicious activity on its information systems.

36. The information involved in the Data Breach included Plaintiffs' and Class Members' names, addresses, dates of birth, Social Security numbers, financial account information, and medical information, which we were maintained in unencrypted form on Defendant's systems.[11]

37. Defendant's conduct, by acts of commission or omission, caused the Data Breach, including, (a) failing to implement best practices and comply with industry standards concerning computer system security to adequately safeguard patient Personal Information, (b) allowing

---

[10] *Id.*
[11] *Id.*

Personal Information to be accessed and stolen, (c) failing to implement security measures that could have prevented, mitigated, or timely detected the Data Breach, (d) failing to adequately train its employees on cybersecurity policies or enforce those policies, and (e) declining to maintain reasonable security practices and systems.

38. As more fully articulated below, Defendant caused Plaintiffs' and Class Members' Personal Information's unauthorized disclosure to, and theft by, third-party cybercriminals in the Data Breach. As a result, Plaintiffs' and Class Members' Personal Information has now or will imminently be posted to the dark web for public viewing and use, in the public domain, and/or utilized for criminal and fraudulent purposes and misuse, including identity theft and financial fraud.

**C. Plaintiffs' Experiences**

***Plaintiff Felicia Cooper***

39. Plaintiff Cooper is a former patient of one of NRS's clients (Vitruvian Health), who received treatment from Vitruvian Health prior to the Data Breach.

40. As a condition of receiving medical services, Plaintiff Cooper was required to provide her Personal Information to NRS, including but not limited to her name, address, date of birth, Social Security number, financial account information, and medical information, in connection with NRS's services contracted by Plaintiff Cooper's healthcare provider.

41. Plaintiff Cooper typically takes measures to protect her Personal Information and is very careful about sharing her Personal Information. Plaintiff Cooper has never knowingly transmitted Personal Information over the internet or other unsecured source. Plaintiff Cooper stores any documents containing her Personal Information in a safe and secure location, and she diligently chooses unique usernames for her passwords and online accounts.

42. In entrusting her Personal Information to NRS, Plaintiff Cooper believed that NRS would adequately safeguard that information. Had Plaintiff Cooper known NRS did not utilize reasonable data security measures, she would not have entrusted her Personal Information to NRS.

43. At the time of the Data Breach, NRS retained Plaintiff Cooper's Personal Information on its network with inadequate data security and in unencrypted form, causing Plaintiff Cooper's Personal Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

44. Plaintiff Cooper received a Notice around April 14, 2025, informing her that her sensitive Personal Information was part of the Data Breach. According to the Notice, unauthorized actors accessed and acquired files containing Plaintiff Cooper's sensitive Private Information, including her name, address, date of birth, Social Security Number, financial account information and other medical information.[12]

45. As a direct and proximate result of the Data Breach that NRS caused and allowed to occur, Plaintiff Cooper has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the Personal Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

46. Plaintiff Cooper has been and will be forced to expend considerable time and effort monitoring her accounts and credit files, changing her online account passwords, verifying the legitimacy of the Notice, and researching the Data Breach, to protect herself from identity theft and fraudulent misuse of her Personal Information, disclosed as a result of NRS's conduct and the consequential Data Breach.

---

[12] Exhibit A.

47. In addition, as a result of the Data Breach, Plaintiff Cooper also suffered diminution in the value of her Personal Information, a form of intangible property that she entrusted to NRS for the sole purpose of obtaining medical services.

48. Furthermore, Plaintiff Cooper has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of her Personal Information in the Data Breach. Plaintiff Cooper fears for her personal financial security and uncertainty over the information disclosed in the Data Breach, and is experiencing emotional distress over the unauthorized disclosure of her Personal Information. She is experiencing feelings of anxiety, embarrassment, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law. Plaintiff Cooper was also outraged that NRS took nearly a year to notify her of the Data Breach even though it was discovered in July 2024.

49. As a result of the Data Breach, Plaintiff Cooper faces a lifetime risk of identity theft, as her Personal Information compromised in the Data Breach includes sensitive data that cannot be changed.

50. Furthermore, Plaintiff Cooper's sensitive Personal Information remains in NRS's possession without adequate protection against known threats, exposing Plaintiff Cooper to the imminent prospect of additional harm.

***Plaintiff Gary Self***

51. Plaintiff Self is a former patient of one of NRS's healthcare provider clients (Vitruvian Health), who received treatment from Vitruvian Health prior to the Data Breach.

52. As a condition of receiving medical services, Plaintiff Self was required to provide

his Personal Information to NRS, including but not limited to his name, address, date of birth, Social Security number, financial account information, and medical information, in connection with NRS's services contracted by Plaintiff Self's healthcare provider.

53. Plaintiff Self typically takes measures to protect his Personal Information and is very careful about sharing his Personal Information. Plaintiff Self has never knowingly transmitted Personal Information over the internet or other unsecured source. He stores any documents containing his Personal Information in a safe and secure location, and diligently chooses unique usernames for his passwords and online accounts.

54. In entrusting his Personal Information to NRS, Plaintiff Self believed that, as part of the payments for medical treatment and services, NRS would adequately safeguard that information. Had Plaintiff Self known that NRS did not utilize reasonable data security measures, he would not have entrusted his Personal Information to NRS.

55. At the time of the Data Breach, NRS retained Plaintiff Self's Personal Information on its network with inadequate data security and in unencrypted form, causing Plaintiff Self's Personal Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

56. Plaintiff Self received a Notice dated April 14, 2025, notifying him that his name, address, Social Security number, date of birth, financial account information, and other medical information were within the files stolen in the Data Breach.[13]

57. As a direct and proximate result of the Data Breach NRS caused and allowed to occur, Plaintiff Self has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the Personal Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal,

[13] Exhibit A.

fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

58. Plaintiff Self has been and will be forced to expend considerable time and effort including monitoring his accounts and credit files, changing his online account passwords, verifying the legitimacy of the Notice, and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of his Personal Information, disclosed as a result of the Data Breach. Plaintiff Self estimates he has spent ***hours*** on these mitigation activities in response to the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

59. In addition, as a result of the Data Breach, Plaintiff Self also suffered diminution in the value of his Personal Information, a form of intangible property that he entrusted to NRS for the sole purpose of obtaining medical services.

60. Furthermore, Plaintiff Self has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Personal Information in the Data Breach.

61. Plaintiff Self fears for his personal financial security and uncertainty over the information disclosed in the Data Breach, and is experiencing emotional distress over the unauthorized disclosure of his Personal Information. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law. Plaintiff Self was also outraged that NRS took nearly a year to notify him of the Data Breach after it was discovered in July 2024.

62. As a result of the Data Breach, Plaintiff Self faces a lifetime risk of identity theft, as his Personal Information compromised in the Data Breach includes sensitive data that cannot be changed.

63. Furthermore, Plaintiff Self's sensitive Personal Information remains in NRS's possession without adequate protection against known threats, exposing Plaintiff Self to the imminent prospect of additional harm.

***Plaintiff Charles Mitchell***

64. Plaintiff Mitchell is the guardian of his mother, who is a patient of one of NRS's healthcare provider clients (Vitruvian Health) and received treatment from Vitruvian Health prior to the Data Breach.

65. As a condition of his mother's receipt of medical services, Plaintiff Mitchell was required to provide his Personal Information to NRS, including but not limited to his name, address, date of birth, Social Security number, financial account information, and medical information, in connection with NRS's services contracted by his mother's healthcare provider.

66. Plaintiff Mitchell typically takes measures to protect his Personal Information and is very careful about sharing his Personal Information. Plaintiff Mitchell has never knowingly transmitted Personal Information over the internet or other unsecured source. He stores any documents containing her Personal Information in a safe and secure location, and diligently chooses unique usernames for his passwords and online accounts.

67. In entrusting his Personal Information to NRS, Plaintiff Mitchell believed that, as part of the payments for medical treatment and services, NRS would adequately safeguard that information. Had Plaintiff Mitchell known that NRS did not utilize reasonable data security measures, he would not have entrusted his Personal Information to NRS.

68. At the time of the Data Breach, NRS retained Plaintiff Mitchell's Personal Information on its network with inadequate data security and in unencrypted form, causing Plaintiff Mitchell's Personal Information to be accessed and exfiltrated by cybercriminals in the

Data Breach.

69. Plaintiff Mitchell received a Notice on or around April 14, 2025, notifying him that his name, address, Social Security number, date of birth, financial account information, and other information were within the files stolen in the Data Breach.[14]

70. As a direct and proximate result of the Data Breach NRS caused and allowed to occur, Plaintiff Mitchell has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the Personal Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

71. Plaintiff Mitchell has been and will be forced to expend considerable time and effort, including monitoring his accounts and credit files, changing his online account passwords, verifying the legitimacy of the Notice, and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of his Personal Information, disclosed as a result of the Data Breach.

72. In addition, as a result of the Data Breach, Plaintiff Mitchell also suffered diminution in the value of his Personal Information, a form of intangible property that he entrusted to NRS for the sole purpose of his mother obtaining medical services.

73. Furthermore, Plaintiff Mitchell has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Personal Information in the Data Breach. Plaintiff Mitchell fears for his personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of his Personal Information. This goes far beyond allegations of mere

---

[14] Exhibit A.

worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law. Plaintiff Mitchell was also outraged that NRS took nearly a year to notify him of the Data Breach after it was discovered in July 2024.

74. Moreover, Plaintiff Mitchell's Personal Information that was compromised in the Data Breach has already been misused, evidenced by the significant increase in spam emails using his Personal Information that he has received since the Data Breach.

75. As a result of the Data Breach, Plaintiff Mitchell faces a lifetime risk of identity theft, as his Personal Information compromised in the Data Breach includes sensitive data that cannot be changed.

76. Furthermore, Plaintiff Mitchell sensitive Personal Information remains in NRS's possession without adequate protection against known threats, exposing Plaintiff Mitchell to the imminent prospect of additional harm.

***Plaintiff Charles Riggs***

77. Plaintiff Riggs is a patient of one of NRS's healthcare provider clients (Rhea Medical), who received treatment from Rhea Medical prior to the Data Breach.

78. As a condition of receiving medical services, Plaintiff Riggs was required to provide his Personal Information to Defendant, including but not limited to his name, address, date of birth, Social Security number, financial account information, and medical information, in connection with NRS's services contracted by Rhea Medical.

79. Plaintiff Riggs typically takes measures to protect his Personal Information and is very careful about sharing his Personal Information. Plaintiff Riggs has never knowingly transmitted Personal Information over the internet or other unsecured source. He stores any documents containing her Personal Information in a safe and secure location and diligently chooses

unique usernames for his passwords and online accounts.

80. In entrusting his Personal Information to Defendant, Plaintiff Riggs believed that, as part of the payments for medical treatment and services, NRS would implement and maintain reasonable and legally compliant measures to adequately safeguard his Personal Information. Had Plaintiff Riggs known that NRS did not utilize reasonable data security measures, he would not have entrusted his Personal Information to Defendant.

81. At the time of the Data Breach, NRS retained Plaintiff Riggs's Personal Information on its network with inadequate data security and in unencrypted form, causing Plaintiff Riggs's Personal Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

82. Plaintiff Riggs received a Notice from Rhea Medical notifying him that his name, address, Social Security number, date of birth, financial account information, and other medical information were within the files stolen in the Data Breach.[15]

83. As a direct and proximate result of the Data Breach Defendant caused and allowed to occur, Plaintiff Riggs has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the Personal Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

84. Plaintiff Riggs's Personal Information that was compromised in the Data Breach has already been misused to commit identity theft against him, evidenced by over $1,900 in attempted fraudulent charges to his financial account in early 2025. Given the fraudulent charges' proximity and sequency in time to the Data Breach and the categories of Personal Information involved (including full names, Social Security numbers, and financial account numbers), this

[15] Exhibit A.

misuse of Plaintiff Rigg's Personal Information is traceable to the Data Breach.

85. Plaintiff Riggs has been and will be forced to expend considerable time and effort, including monitoring his accounts and credit files, changing his online account passwords, verifying the legitimacy of the Notice, and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of his Personal Information, disclosed as a result of the Data Breach. Additionally, Plaintiff Riggs has spent significant time investigating the attempted fraudulent charges to his account caused by the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

86. In addition, as a result of the Data Breach, Plaintiff Riggs also suffered diminution in the value of his Personal Information, a form of intangible property that he entrusted to Defendant for the sole purpose of obtaining medical services.

87. Furthermore, Plaintiff Riggs has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Personal Information in the Data Breach. Plaintiff Riggs fears for his personal financial security and uncertainty over the information disclosed in the Data Breach, and is experiencing emotional distress over the unauthorized disclosure of his Personal Information. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law. Plaintiff Riggs was also outraged that Defendant took nearly a year to notify him of the Data Breach after it was discovered in July 2024.

88. As a result of the Data Breach, Plaintiff Riggs faces a lifetime risk of identity theft, as his Personal Information compromised in the Data Breach includes sensitive data that cannot be changed.

89. Furthermore, Plaintiff Riggs's sensitive Personal Information remains in Defendant's possession without adequate protection against known threats, exposing Plaintiff Riggs to the imminent prospect of additional harm.

***Plaintiff Peggy Long***

90. Plaintiff Long is and at all times mentioned herein was an individual citizen of North Carolina, residing in the city of Hayesville.

91. Plaintiff is a patient of one of NRS's healthcare provider clients (Erlanger Health) and received treatment from Erlanger Health prior to the Data Breach.

92. Plaintiff received a Notice around April 11, 2025, informing her that her sensitive information was part of Defendant's Data Breach. According to the Notice, the unauthorized actor accessed and acquired files containing Plaintiff's sensitive Private Information, including her name, address, date(s) of service and Social Security Number.[16]

93. Plaintiff is very careful about sharing her sensitive PII and PHI. She has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source. Plaintiff also stores any documents containing her sensitive information in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

94. In entrusting her Personal Information to NRS, Plaintiff Long believed that, as part of the payments for medical treatment and services, NRS would adequately safeguard that information. Had Plaintiff Long known that NRS did not utilize reasonable data security measures, she would not have entrusted his Personal Information to NRS.

95. At the time of the Data Breach, NRS retained Plaintiff Long's Personal Information

[16] Exhibit A.

on its network with inadequate data security and in unencrypted form, causing Plaintiff Long's Personal Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

96. As a direct and proximate result of the Data Breach NRS caused and allowed to occur, Plaintiff Long has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the Personal Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

97. Plaintiff Long has been and will be forced to expend considerable time and effort including monitoring her accounts and credit files, changing her online account passwords, verifying the legitimacy of the Notice, and researching the Data Breach, to protect herself from identity theft and fraudulent misuse of her Personal Information, disclosed as a result of the Data Breach.

98. In addition, as a result of the Data Breach, Plaintiff Long also suffered diminution in the value of her Personal Information, a form of intangible property that she entrusted to NRS for the sole purpose of obtaining medical services.

99. Furthermore, Plaintiff Long has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of her Personal Information in the Data Breach. Plaintiff Long fears for her personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of her Personal Information. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law. Plaintiff Long was also outraged that NRS took nearly a year to notify her of the Data Breach after it was discovered in July 2024.

100. As a result of the Data Breach, Plaintiff Long faces a lifetime risk of identity theft, as her Personal Information compromised in the Data Breach includes sensitive data that cannot be changed.

101. Furthermore, Plaintiff Long's sensitive Personal Information remains in NRS's possession without adequate protection against known threats, exposing Plaintiff Long to the imminent prospect of additional harm.

**D. The Data Breach was Foreseeable to Defendant**

102. Plaintiffs and Class Members provided their Personal Information to NRS's healthcare provider clients with the reasonable expectation and mutual understanding that NRS would comply with their obligations to keep such information confidential and secure from unauthorized access.

103. By failing to do so, Defendant put Plaintiff and Class Members at risk of identity theft, financial fraud, and other harms.

104. Defendant tortiously, or in breach of their contracts, failed to take the necessary precautions required to safeguard and protect the Personal Information of Plaintiff and Class Members from unauthorized disclosure. Defendant's actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

105. Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting, sharing, and storing Personal Information and the critical importance of providing adequate security for that data.

106. According to a Chief Strategy Officer at ClearDATA, "It's no secret that healthcare is the industry most plagued by data breaches. Patient data is the most valuable, making it targeted

by bad actors."[17]

107. Moreover, healthcare companies are targeted because of their cybersecurity vulnerabilities: "…healthcare is also targeted because it is very vulnerable. Many healthcare providers use outdated IT infrastructure and operating systems that can no longer be patched or supported, such as Windows 7 and Windows Server 2008, even after Microsoft retired them. Further, more than half of medical devices operate on legacy systems, and 83% of medical imaging devices are on outdated operating systems that no longer receive patches/updates. This creates significant cybersecurity vulnerabilities and makes it much easier for bad actors to find an entry point into the network." [18]

108. Cyber-attacks against organizations operating in the healthcare industry such as Defendant are targeted and frequent. According to the 2019 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[a] pattern of cybersecurity threats and experiences is discernable across U.S. healthcare organizations. Significant security incidents are a near-universal experience in U.S. healthcare organizations with many of the incidents initiated by bad actors…"[19]

109. In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[20]

110. Of the 1,473 recorded data breaches, 525 of them, or 35.64%, were in the medical

---

[17] Sanjay Cherian, Forbes Magazine, *Healthcare Data: The Perfect Storm* (Jan. 14, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=28523ee56c88 (last accessed. June 19, 2023).
[18] *Id.*
[19] Healthcare Info. and Mgmt. Sys. Society, *2019 HIMSS Cybersecurity Survey*, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last accessed December 7, 2022)
[20] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed Dec. 7, 2022)


Case 1:25-cv-00130-TRM-CHS Document 67 Filed 10/16/25 Page 21 of 58
PageID #: 543

or healthcare industry.[21]

111. According to the Identity Theft Resource Center's January 24, 2022 report for 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[22]

112. According to the ITRC's January 2023 report for 2022, "[t]he number of publicly reported data compromises in the U.S. totaled 1,802 in 2022. This represents the second highest number of data events in a single year and just 60 events short of matching 2021's all-time high number of data compromises."[23] In 2022, there were approximately 422 million individuals affected by cyberattacks.[24]

113. Moreover, of the 1,802 data breaches in 2022, ITRC reported that 1,560 involved compromised names, 1,143 involved compromised of Social Security Numbers, and 633 involved compromised dates of birth—types of PII included in the unauthorized disclosure in this Data Breach.[25]

114. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry. According to IBM's 2022 report, "[f]or 83%

---

[21] *Id.*

[22] *See Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises*, (Jan. 24, 2022), https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last accessed Apr. 14, 2023).

[23] Identity Theft Resource Center, 2022 Data Breach Report, https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf, pg. 7 (last accessed Jul. 3, 2023).

[24] *See id.* at 2.

[25] *Id.* at 6.

of companies, it's not if a data breach will happen, but when."[26]

115. Furthermore, Defendant was aware of the risk of data breaches because such breaches have dominated the headlines in recent years. For instance, the 525 reported medical or healthcare data breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[27]

116. According to the U.S. Department for Health and Human Services' "2022 Healthcare Cybersecurity Year in Review, and a 2023 Look-Ahead," "[h]ealthcare data breaches have doubled in 3 years."[28]

117. Personal Information is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware and fraudulent misuse, and publication or sale on the dark web.

118. Personal Information can be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and medical records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

119. Given the nature of the Data Breach, it was foreseeable that the compromised Personal Information could be used by hackers and cybercriminals in a variety of different

---

[26] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond*, https://www.ibm.com/reports/data-breach (last accessed Apr. 14, 2023).
[27] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed Dec. 7, 2022), at pg. 15.
[28] U.S. Department for Health and Human Services, The Health Sector Cybersecurity Coordination Center (HC3), *2022 Healthcare Cybersecurity Year in Review, and a 2023 Look-Ahead*, (Feb. 9, 2023), https://www.hhs.gov/sites/default/files/2022-retrospective-and-2023-look-ahead.pdf.

injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Personal Information can easily obtain their tax returns or open fraudulent credit card accounts in their names.

**E. Defendant Failed to Comply with FTC Guidelines.**

120. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

121. In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of PII/PHI that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[29]

122. The FTC further recommends that companies not maintain PII/PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security

[29] *See* Fed. Trade Comm'n, October 2016, *Protecting Private information: A Guide for Business*, https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last acc. Apr. 14, 2023).

measures.[30]

123. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

124. These FTC enforcement actions include actions against entities in the healthcare industry that fail to safeguard Personal Information, such as Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

125. NRS failed to properly implement basic data security practices widely known throughout the industry. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**F. Defendant Violated HIPAA.**

126. Upon information and belief, NRS and the healthcare entities that Plaintiffs provided their Private Information to signed Business Associate Agreements, which are required whenever a Covered Entity grants a third-party vendor access to PHI in the course of providing services. As a result, NRS is a business associate as defined under HIPAA, 45 C.F.R. § 160.103, and is therefore required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R.

[30] *See id.*

Part 160, Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and C.

127. NRS is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. *See* 42 U.S.C. §17921; 45 C.F.R. § 160.103.

128. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

129. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

130. HIPAA's Security Rule required and requires that NRS do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

131. HIPAA also required and requires NRS to "review and modify the security

measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, NRS is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

132. HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. See 45 C.F.R. § 164.306(a)(1), (a)(3).

133. HIPAA further requires covered entities like Defendant to have and apply appropriate sanctions against members of their workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

134. HIPAA further requires covered entities like Defendant to mitigate, to the extent practicable, any harmful effect that is known to the entity of a use or disclosure of PHI in violation of the entity's policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

135. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements

of the Security Rule." The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."

136. HIPAA's Breach Notification Rule further requires that within 60 days of discovering a breach of unsecured patient PHI, as is this Data Breach, the affected entity must notify each individual affected regarding the nature of the breach, the PHI compromised, steps the individual should take to protect against potential resulting harm, and what Defendant is doing to protect against future breaches. 45 C.F.R. § 164.404(b).

137. As alleged herein, Defendant violated HIPAA and HITECH. They (a) failed to maintain adequate security practices, systems, and protocols to prevent data loss, (b) failed to mitigate the risks of a data breach, (c) failed to ensure the confidentiality and protection of PHI, and (d) failed to provide the required notice of the Data Breach within 60 days of discovering the incident.

### G. NRS Failed to Comply with Industry Standards

138. As shown above, experts studying cyber security routinely identify organizations holding Private Information as being particularly vulnerable to cyber-attacks because of the value of the information they collect and maintain. As of 2022, ransomware breaches like that which occurred here had grown by 41% in the last year and cost on average $4.54 million dollars.[31]

139. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best

[31] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond*, https://www.ibm.com/reports/data-breach (last accessed Apr. 14, 2023).

practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[32]

140. In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.
- Use security software to protect data.
- Encrypt sensitive data, at rest and in transit.
- Conduct regular backups of data.
- Update security software regularly, automating those updates if possible.
- Have formal policies for safely disposing of electronic files and old devices.
- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[33]

---

[32] *See* https://www.rapid7.com/solutions/compliance/critical-controls/ (last accessed Apr. 14, 2023).

[33] Fed. Trade Comm'n, *Understanding the NIST Cybersecurity Framework*, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Apr. 14, 2023).

141. Upon information and belief, NRS failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Personal Information, resulting in the Data Breach.

### H. Defendant Owed Common Law Duties to Safeguard Plaintiffs' and Class Members' Personal Information

142. In addition to its obligations under federal and state laws, NRS owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

143. These duties owed to Plaintiffs and Class Members obligated NRS to provide reasonable data security consistent with industry standards and requirements to protect Plaintiffs' and Class Members' Personal Information in its care from unauthorized disclosure, and to timely and adequately warn Plaintiffs and Class Members in the event their Personal Information was compromised.

144. NRS owed duties to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Personal Information in its possession, including adequately training its employees and others who accessed Personal Information on how to adequately protect the data.

145. NRS owed duties to Plaintiffs and Class Members to implement processes that would detect a compromise of Personal Information in a timely manner, before thousands of individuals' Personal Information was taken.

146. NRS owed duties to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

147. NRS owed duties to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred, and the extent of Personal Information involved.

148. NRS owed duties to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

149. NRS failed to take the necessary precautions to safeguard and protect Plaintiffs' and Class Members' Personal Information from unauthorized disclosure. NRS's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

### I. The Data Breach Caused Plaintiffs and Class Members Injuries and Damages

150. Plaintiffs and Class Members have suffered injuries and damages from the unauthorized disclosure of their Personal Information in the Data Breach, which can be directly traced to NRS's failure to adequately protect that Personal Information.

151. Through the Data Breach, unauthorized cybercriminals were able to access the Plaintiffs' and the proposed Class Members' Personal Information, which on information and belief is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale, causing widespread injury and damages.

152. The ramifications of Defendant's failures to keep Plaintiff's and the Class's Personal Information secure are severe. Identity theft occurs when someone uses another's

personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

153. Because Defendant failed to prevent the Data Breach, Plaintiffs and Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and Class Members have suffered, are at an increased risk of suffering, or will imminently suffer the following harms:

a. exposure of that Personal Information, including said information being posted on the dark web for fraudulent, criminal activity or sale;

b. fraudulent misuse of Personal Information, including fraudulent loans taken out using Personal Information acquired in the Data Breach, fraudulent cellular telephone accounts taken out using Personal Information acquired in the Data Breach; and, identity theft and impersonation using Personal Information acquired in the Data Breach;

c. Malware, and increase in spam emails;

d. The loss of the opportunity to control how Personal Information is used;

e. The diminution in value of their Personal Information;

f. The compromise and continuing publication of their Personal Information;

g. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

h. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent


Case 1:25-cv-00130-TRM-CHS Document 67 Filed 10/16/25 Page 32 of 58 PageID #: 554

researching how to prevent, detect, contest, and recover from identity theft and fraud;

i. Emotional Distress;

j. Delay in receipt of tax refund monies;

k. Unauthorized use of stolen Personal Information; and

l. The continued risk to their Personal Information, which remains in the possession of Defendant and is subject to further breaches so long as NRS fails to undertake the appropriate measures to protect the Personal Information in its possession.

154. Furthermore, the Data Breach has placed Plaintiffs and Class Members at an increased and imminent risk of fraud and identity theft.

155. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the dark web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[34]

156. The FTC recommends that identity theft victims take several costly steps to protect

---

[34] *See* Gaetano DiNardi, Aura.com, *How Bad Is Identity Theft? Is It Serious?* (Dec. 14, 2022) https://www.aura.com/learn/dangers-of-identity-theft (last accessed Feb. 27, 2023).

their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[35]

157. The time-consuming process recommended by the FTC and other experts is complicated by the vulnerable situations of NRS's clients' patients.

158. Identity thieves use stolen Personal Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

159. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

160. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Personal Information to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

161. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their

---

[35] *See* https://www.identitytheft.gov/Steps (last accessed Sept. 1, 2021).

mortgage. Fifty-four percent reported feelings of being violated.[36]

162. What's more, theft of Personal Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Personal Information is a valuable property right.[37]

163. The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that PHI has considerable market value.

164. Theft of Personal Information, in particular, is problematic because: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[38]

165. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed Personal Information to

---

[36] *See* Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (June 11, 2021), https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ (citing Identity Theft Resource Center, *2021 Consumer Aftermath Report*, (May 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims).
[37] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private information") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[38] *See Medical Identity Theft, Federal Trade Commission Consumer Information* (last visited: June 7, 2022), http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

adjust their insureds' medical insurance premiums.

166. It must also be noted there may be a substantial time lag–measured in years–between when harm occurs versus when it is discovered, and also between when Personal Information and/or financial information is stolen and when it is used.

167. Personal Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

168. Where the most Personal Information belonging to Plaintiffs and Class Members was accessible from NRS's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

169. Thus, Plaintiffs and the Class Members must vigilantly monitor their financial and medical accounts for many years to come.

170. According to cybersecurity experts, "[r]eports show the value of a health record can be worth as much as $1,000, whereas on the dark web, a credit card number is worth $5 and Social Security numbers are worth $1."[39]

171. Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as

[39] Sanjay Cherian, Forbes Magazine, "Healthcare Data: The Perfect Storm," January 14, 2022, https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=28523ee56c88 (last accessed June 19, 2023).

is the case here, can lead to identity theft and extensive financial fraud.[40]

172. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[41] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

173. Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[42]

174. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security Numbers are worth more than

---

[40] *See* U.S. Social Security Administration, "Identity Theft and Your Social Security Number," Publication No. 05-10064, July 2021, https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Feb. 25, 2023)
[41] *See id.*
[42] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed September 1, 2021).

10x on the black market."[43] Medical information is especially valuable to identity thieves. The asking price on the dark web for medical data is $50 per person and up.[44]

175. Accordingly, the Data Breach has caused Plaintiffs and Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the imminent identity fraud and criminal fraudulent activity, lost time and efforts in remediating the impact of the Data Breach, and other injuries and damages as set forth in the preceding paragraphs.

176. Defendant knew or should have known of these harms which would be caused by the Data Breach they permitted to occur. NRS should have strengthened its data systems accordingly.

## CLASS ACTION ALLEGATIONS

177. Plaintiffs bring this nationwide class action on behalf of themselves and others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

178. The Classes Plaintiffs Seek to represent are defined as follows:

> <u>Nationwide Class</u>
> All individuals in the United States whose Personal Information may have been impacted by the Data Breach, including all who received a Notice.
>
> <u>Georgia Subclass:</u>
> All Georgia residents whose Personal Information may have been impacted by the Data Breach, including all who received a Notice.
>
> <u>Tennessee Subclass:</u>
> All Tennessee residents whose Personal Information may have been impacted by the Data Breach, including all who received a Notice.

---

[43] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed September 1, 2021).

[44] *See* Omri Toppol, *Email Security: How You Are Doing It Wrong & Paying Too Much*, LogDog (Feb. 14, 2016), https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/ (last accessed September 1, 2021).

North Carolina Subclass:
All North Carolina residents whose Personal Information may have been impacted by the Data Breach, including all who received a Notice.

179. Excluded from the Classes are Defendant's officers, directors, and employees; any entity in which Defendant have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Classes are members of the judiciary to whom this case is assigned, their families and Members of their staff.

180. Plaintiffs reserve the right to amend or modify the Class definitions as this case progresses and based on information obtained through discovery.

181. Plaintiffs assert that for all causes of action brought in this Complaint, Georgia law applies for Plaintiffs Self, Cooper, Mitchell and the Georgia Subclass, Tennessee law applies for Plaintiff Riggs and the Tennessee Subclass, and North Carolina law applies for Plaintiff Long and the North Carolina Subclass.

182. Numerosity. The Members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Classes each consist of thousands of individuals whose sensitive data was compromised in the Data Breach.

183. Commonality. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. if Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Personal Information;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the

information compromised in the Data Breach;

c. if Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. if Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. if Defendant owed a duty to Class Members to safeguard their Personal Information;

f. if Defendant breached their duty to Class Members to safeguard their Personal Information;

g. if Defendant knew or should have known that their data security systems and monitoring processes were deficient;

h. if Defendant should have discovered the Data Breach sooner;

i. if Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j. if Defendant's conduct was negligent;

k. if Defendant breached implied contracts with Plaintiffs and Class Members;

l. if Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

m. if Defendant failed to provide notice of the Data Breach in a timely manner, and;

n. if Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

184. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Personal Information, like that of every other Class Member, was compromised in the Data Breach.

185. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

186. Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

187. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

188. Defendant has acted on grounds that apply generally to the Classes as a whole, so

that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

189. Likewise, particular issues under Rule 42(d)(l) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. if Defendant failed to timely notify the public of the Data Breach;

b. if Defendant owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, and safeguarding their PII;

c. if Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. if Defendant's failure to institute adequate protective security measures amounted to negligence;

e. if Defendant failed to take commercially reasonable steps to safeguard consumer PII; and

f. if adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

190. Finally, all members of the proposed Classes are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Breach by Defendant.

## COUNT I
## NEGLIGENCE
## (On Behalf of Plaintiffs and the Classes)

191. Plaintiffs repeat and re-allege paragraphs 1 through 187 of this Complaint and incorporate them by reference herein.

192. Plaintiffs and Class Members entrusted their Personal Information to their healthcare providers, who entrusted Plaintiffs' and Class Members' Personal Information to NRS in connection with NRS's contracted services.

193. NRS owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using the Personal Information in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

194. NRS owed a duty of care to Plaintiff and Class Members because it was foreseeable that NRS's failure to adequately safeguard the Personal Information in accordance with statutes, regulations, and industry standards concerning data security would result in the compromise of that Personal Information—just like the Data Breach that ultimately came to pass.

195. NRS owed to Plaintiffs and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their Personal Information. NRS also owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their Personal Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

196. NRS actively sought and obtained Plaintiffs' and Class Members' Personal Information to perform its contracts with Plaintiffs' and Class Members' healthcare providers, but failed to protect it once obtained.

197. The risk that unauthorized persons would attempt to gain access to the Personal Information and misuse it was foreseeable. Given that NRS holds vast amounts of Personal Information, it was inevitable that unauthorized individuals would attempt to access its databases containing the Personal Information—whether by a sophisticated cyberattack or otherwise.

198. Personal Information is highly valuable, and NRS knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Personal Information of Plaintiff and Class Members and the importance of exercising reasonable care in handling it.

199. NRS breached its duties by failing to exercise reasonable care in handling and securing the Personal Information of Plaintiffs and Class Members, which actually and proximately caused the Data Breach and Plaintiffs' and Class Members' resulting injuries and damages.

200. NRS further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class Members' injuries-in-fact.

201. As a direct, proximate, and traceable result of NRS's negligence, Plaintiffs and Class Members have suffered or will imminently suffer injury-in-fact and damages, as set forth in the preceding paragraphs.

202. NRS's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including: exposure of that Personal Information, including being

posted on the dark web for fraudulent, criminal activity or sale; fraudulent misuse of Personal Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft and impersonation using Personal Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Personal Information is used; diminution in value of their Personal Information; compromise and continuing publication of their Personal Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional distress; delay in receipt of tax refund monies; unauthorized use of stolen Personal Information; the continued risk to their Personal Information, which remains in the possession of NRS and is subject to further breaches so long as NRS fails to undertake the appropriate measures to protect the Personal Information in its possession.

203. As a result of the negligence of NRS, Plaintiffs and Class Members are entitled to recover actual, compensatory, and punitive damages.

204. Plaintiffs and Class Members are also entitled to injunctive relief requiring NRS to (a) properly notify affected victims of the Data Breach (b) strengthen its data security systems and monitoring procedures; (c) submit to future annual audits of those systems and monitoring procedures; and (d) provide adequate credit monitoring to all Class Members.

205. Unless and until enjoined and restrained by order of this Court, NRS's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the Personal Information maintained by NRS can be viewed, distributed, and used by unauthorized

persons for years to come. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for damages will not end the exposure of their Personal Information.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Classes)**

206. Plaintiffs repeat and re-allege paragraphs 1 through 187 of this Complaint and incorporate them by reference herein.

207. Pursuant to the FTC Act, 15 U.S.C. § 45, NRS had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

208. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as NRS, of failing to use reasonable measures to protect patients' Personal Information. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of NRS's duty to protect Plaintiffs' and Class Members' sensitive Personal Information.

209. NRS violated its duties under Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Plaintiffs' and the Class's Personal Information and failing to comply with applicable industry standards as described in detail herein.

210. NRS's conduct was particularly unreasonable given the nature and amount of Personal Information NRS collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to patients in the event of a breach, which ultimately came to pass.

211. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that,

because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

212. NRS had a duty to Plaintiff and the Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and the Class's Personal Information.

213. NRS breached its duties to Plaintiffs and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

214. NRS's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations including HIPAA constitutes negligence *per se*.

215. But-for NRS's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

216. The injuries and harms suffered by Plaintiffs and Class Members were the reasonably foreseeable result of NRS's breach of its duties. NRS knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiffs and Class Members to suffer the foreseeable harms associated with the wrongful exposure of their Personal Information.

217. As a direct and proximate result of NRS's negligence *per se*, Plaintiffs and Class Members have suffered actual, tangible, injury-in-fact and damages, including exposure of that Personal Information, including being posted on the dark web for fraudulent, criminal activity or sale; increased and imminent risk of identity theft; fraudulent misuse of Personal Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft and impersonation using Personal Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Personal Information is used; diminution in

value of their Personal Information; compromise and continuing publication of their Personal Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional distress; delay in receipt of tax refund monies; unauthorized use of stolen Personal Information; and the continued risk to their Personal Information, which remains in the possession of NRS and is subject to further breaches so long as NRS fails to undertake the appropriate measures to protect the Personal Information in its possession.

218. As a result of the negligence *per se* of NRS, Plaintiffs and Class Members are entitled to recover actual, compensatory, and punitive damages in an amount to be determined at trial.

## COUNT III
## GROSS NEGLIGENCE
## (On Behalf of Plaintiff Riggs and the Tennessee Subclass)

219. Plaintiff Riggs repeats and re-alleges paragraphs 1 through 187 of this Complaint and incorporates them by reference herein.

220. Plaintiff Riggs brings this count on behalf of himself and the Tennessee Subclass.

221. Plaintiff Riggs and Tennessee Subclass Members entrusted their Personal Information to their healthcare providers, who entrusted Plaintiff Riggs' and Tennessee Subclass Members' Personal Information to NRS in connection with NRS's contracted services.

222. NRS owed to Plaintiff Riggs and Tennessee Subclass Members a duty to exercise reasonable care in handling and using the Personal Information in its care and custody, including

implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

223. NRS owed a duty of care to Plaintiff Riggs and Tennessee Subclass Members because it was foreseeable that NRS's failure to adequately safeguard the Personal Information in accordance with statutes, regulations, and industry standards concerning data security would result in the compromise of that Personal Information—just like the Data Breach that ultimately came to pass.

224. NRS acted with wanton and reckless disregard for the security and confidentiality of Plaintiff Riggs' and Tennessee Subclass Members' Personal Information by disclosing and providing access to this information to third parties and by failing to implement and maintain safeguards, like multifactor authentication and encryption, to keep the Personal Information protected when stored, used, and transmitted.

225. NRS owed to Plaintiff Riggs and Tennessee Subclass Members a duty to notify them within a reasonable timeframe of any breach to the security of their Personal Information. NRS also owed a duty to timely and accurately disclose to Plaintiff Riggs and Tennessee Subclass Members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff Riggs and Tennessee Subclass Members to take appropriate measures to protect their Personal Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

226. NRS owed these duties to Plaintiff Riggs and Tennessee Subclass Members because they are members of a well-defined, foreseeable, and probable class of individuals whom NRS knew or should have known would suffer injury-in-fact from said NRS's inadequate security

protocols.

227. NRS actively sought and obtained Plaintiff Riggs' and Tennessee Subclass Members' Personal Information to perform its contracts with Plaintiff Riggs' and Tennessee Subclass Members' healthcare providers, but failed to protect it once obtained.

228. The risk that unauthorized persons would attempt to gain access to the Personal Information and misuse it was foreseeable. Given that NRS holds vast amounts of Personal Information, it was inevitable that unauthorized individuals would attempt to access its databases containing the Personal Information—whether by a sophisticated cyberattack or otherwise.

229. Personal Information is highly valuable, and NRS knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Personal Information of Plaintiff Riggs and Tennessee Subclass Members and the importance of exercising reasonable care in handling it.

230. NRS breached its duties by failing to exercise reasonable care in handling and securing the Personal Information of Plaintiff Riggs and Tennessee Subclass Members, which actually and proximately caused the Data Breach and Plaintiff Riggs' and Tennessee Subclass Members' resulting injuries and damages.

231. NRS further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff Riggs and Tennessee Subclass Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class Members' injuries-in-fact.

232. As a direct, proximate, and traceable result of NRS's gross negligence, Plaintiff Riggs and Tennessee Subclass Members have suffered or will imminently suffer injury-in-fact and damages, as set forth in the preceding paragraphs.

233. NRS's breach of its common-law duties to exercise reasonable care and its failures

and gross negligence actually and proximately caused Plaintiff Riggs and Tennessee Subclass Members actual, tangible, injury-in-fact and damages, including: exposure of that Personal Information, including being posted on the dark web for fraudulent, criminal activity or sale; fraudulent misuse of Personal Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft and impersonation using Personal Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Personal Information is used; diminution in value of their Personal Information; compromise and continuing publication of their Personal Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional distress; delay in receipt of tax refund monies; unauthorized use of stolen Personal Information; the continued risk to their Personal Information, which remains in the possession of NRS and is subject to further breaches so long as NRS fails to undertake the appropriate measures to protect the Personal Information in its possession.

234. As a result of the gross negligence of NRS, Plaintiff Riggs and Tennessee Subclass Members are entitled to recover actual, compensatory, and punitive damages.

235. Unless and until enjoined and restrained by order of this Court, NRS's wrongful conduct will continue to cause great and irreparable injury to Plaintiff Riggs and Tennessee Subclass Members in that the Personal Information maintained by NRS can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff Riggs and Tennessee Subclass Members have no adequate remedy at law for the injuries in that a judgment for damages will not

end the exposure of their Personal Information.

**COUNT IV**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and the Classes)**

236. Plaintiffs repeat and re-allege paragraphs 1 through 187 of this Complaint and incorporate them by reference herein.

237. Plaintiffs and Class Members are third-party beneficiaries of contracts entered into between their healthcare providers and NRS, under which NRS received Plaintiffs' and Class Members' Personal Information, stored that information in its computer network systems, and provided medical billing and revenue cycle management services to Plaintiffs' and Class Members' healthcare providers, NRS's customers.

238. Upon information and belief, all of NRS's contracts with its healthcare provider clients, including Plaintiffs' and Class Members' healthcare providers, obligated NRS to implement and maintain reasonable, industry-standard, HIPAA-compliant measures to protect the Personal Information NRS received, used, and stored in the course of performing these contracts from unauthorized disclosure.

239. Plaintiffs and Class Members, as patients of healthcare providers that contracted with NRS, were the intended beneficiaries of NRS's contractual obligations with respect to data security, in that these obligations were expressly undertaken for the protection of NRS's clients' patients' Personal Information.

240. NRS breached the foregoing contracts by failing to adequately protect Plaintiffs' and the Class Members' Personal Information in accordance with its contractual obligations, causing its unauthorized access, exposure, and theft in the Data Breach, and Plaintiffs' and Class Members' attendant injuries and damages.

241. As a direct and proximate result of NRS's breach of third-party beneficiary contract, Plaintiff and Class Members are entitled to actual, compensatory, and consequential damages, in an amount to be determined at trial.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Classes)**

242. Plaintiffs repeat and re-allege paragraphs 1 through 187 of this Complaint and incorporate them by reference herein.

243. Plaintiffs and Class Members conferred a benefit upon NRS by providing their Personal Information to NRS, which NRS used to perform its contracts with Plaintiffs' and Class Members' healthcare providers and generate revenue therefrom.

244. NRS appreciated and had knowledge of the benefits conferred upon it by Plaintiffs and Class Members, and could not perform its contracts with its healthcare provider clients without obtaining Plaintiffs' and Class Members' Personal Information.

245. As a result of NRS's inequitable conduct and resulting unjust enrichment, including its decision not to implement and maintain adequate, industry-standard measures for the Personal Information it obtained under its contracts with Plaintiffs' and Class Members' healthcare providers, Plaintiffs and Class Members are entitled to restitution of NRS's ill-gotten gains, including the profit NRS obtained through collecting, storing, and using Plaintiffs' and Class Members' Personal Information to perform its contracts with their healthcare providers while failing to implement reasonable, expected measures to protect it from this foreseeable, preventable Data Breach.

246. Under principles of equity and good conscience, NRS should not be permitted to retain the full value of its profits off Plaintiff's and the proposed Class Members' Personal

Information because NRS failed to adequately protect their Personal Information, to Plaintiffs' and Class Members' detriments.

247. NRS should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it because of its misconduct alleged herein.

**COUNT VI**
**INVASION OF PRIVACY—PUBLIC DISCLOSURE OF PRIVATE FACTS**
**(On Behalf of Plaintiffs and the Classes)**

248. Plaintiffs repeat and re-allege paragraphs 1 through 187 of this Complaint and incorporate them by reference herein.

249. Plaintiffs and Class Members took reasonable and appropriate steps to keep their Personal Information confidential from the public.

250. Plaintiffs' and the Class Members' efforts to safeguard their own Personal Information were successful, as their Personal Information was not known to the general public prior to the Data Breach.

251. Plaintiffs and Class Members had a legitimate expectation of privacy to their Personal Information—which included sensitive health and financial information—entrusted to NRS for the sole purpose of receiving medical treatment, which Plaintiffs' and Class Members' healthcare providers disclosed to NRS to perform medical billing services.

252. Plaintiffs and Class Members were entitled to the protection of this information against disclosure to unauthorized third parties when it was in NRS's custody and control.

253. NRS owed a duty to Plaintiff and the Class Members to keep their sensitive, private Personal Information confidential.

254. NRS's unauthorized release and publication of Personal Information to

cybercriminals in the Data Breach is highly offensive to a reasonable person.

255. Plaintiffs' and Class Members' Personal Information exposed in the Data Breach is not of legitimate concern to the public.

256. NRS knew or should have known that Plaintiffs' and Class Members' Personal Information was private, confidential, and should not be disclosed.

257. NRS publicized Plaintiffs' and Class Members' Personal Information by unauthorizedly disclosing it to cybercriminals who had no legitimate interest in this data and who had the express purpose of monetizing that information through fraudulent misuse and by injecting it into the illicit stream of commerce flowing through the dark web.

258. Indeed, not only is Plaintiffs' and Class Members' Personal Information almost certainly published on the dark web, but upon information and belief, it is being used to commit fraud; it is being disseminated amongst, *inter alia,* financial institutions, merchants, creditors, health care providers and governmental agencies.

259. It is therefore likely that Plaintiffs' and Class Members' Personal Information is rapidly becoming public knowledge—among the community at large—due to the nature of the Data Breach that caused its disclosure, and the identity theft for which the Data Breach was designed.

260. Moreover, the publication requirement is met because the Sensitive Information was disclosed to cybercriminals and identity thieves who are in a special relationship with Plaintiffs and the Class because they are the exact individuals from whom the cybersecurity measures are intended to protect Plaintiffs and the Class.

261. Further, the definition of intent is met under Section 8A of the Restatement (Second) of Torts because, given the ubiquity of data breaches, Defendant were substantially

certain that their decisions to forego reasonable cybersecurity measures would lead to a data breach and the inherent harms therein.

262. As a direct and proximate result of the invasion of privacy, public disclosure of private facts committed by NRS, Plaintiffs and Class Members have suffered injury-in-fact and damages as set forth in the preceding paragraphs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel to represent the Class;

B. Awarding Plaintiffs and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

E. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 16, 2025

Respectfully submitted,


*<u>/s/ J. Gerard Stranch, IV</u>*
J. Gerard Stranch, IV (BPR 23045)
Grayson Wells (BPR 039658)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Ave., Ste. 200
Nashville, TN 37203
Tel: (615) 254-8801
Fax: (615) 255-5419
gstranch@stranchlaw.com
gwells@stranchlaw.com

Andrew J. Shamis
**SHAMIS & GENTILE P.A.**
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Tel: (305) 479-2299
ashamis@shamisgentile.com

Jeff Ostrow*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
Fax: (954) 525-4300
ostrow@kolawyers.com

**Pro hac vice*

***Interim Co-Lead Counsel***

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, October 16, 2025, the foregoing Amended Consolidated Class Action Complaint was filed electronically with the Clerk of Court using the Court's CM/ECF system. Which will then send notification to all counsel of record.

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR 23045)